## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DILLEY PRO BONO PROJECT, 111 Pipes Drive, Dilley, TX  78017; CAROLINE PERRIS, 111 Pipes Drive, Dilley, TX  78017; and SHALYN FLUHARTY, 111 Pipes Drive, Dilley, TX 78017, <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 500 12th Street, S.W., Washington, DC  20536; U.S. DEPARTMENT OF HOMELAND SECURITY, 3801 Nebraska Avenue, N.W., Washington, DC  20016; JOHN F. KELLY, Secretary of Homeland Security, in his official capacity, 3801 Nebraska Avenue, N.W., Washington, DC 20016; THOMAS D. HOMAN, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity, 500 12th Street, S.W., Washington, DC  20536; and DANIEL A. BIBLE, Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity, 1777 NE Loop 410, Suite 1500, San Antonio, TX  78217, <br><br> *Defendants.* | Civil Action No. 1:17-cv-_____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Each year, Defendant U.S. Immigration and Customs Enforcement (ICE) detains thousands of mothers and children who seek asylum or other protection in the United States. Legal service providers such as the Dilley Pro Bono Project (DPBP) invest money and other resources to provide access to legal assistance, and have constitutional and statutory rights to assist such individuals.   ICE's largest family detention facility, the South Texas Family Residential Center (STFRC), is located near Dilley, Texas.   At STFRC, DPBP generally represents between 100 and 500 new clients each week.   This lawsuit arises from a new written ICE policy that arbitrarily interferes with the ability of DPBP staff to effectively represent their clients.

2.      Since the establishment of STFRC in late 2014, ICE has cleared legal service providers to enter the facility to meet confidentially with detainees, provide legal advice, and assist them in preparing their cases.   ICE provides offices and telephones that providers and detainees may use during their confidential meetings to call anyone they wish for case-related purposes, including mental health professionals.

3.      Because the mothers and children held in STFRC have fled some of the most violent countries in the world, a mental health evaluation is often a crucial piece of evidence for them.   Such an evaluation can bolster an asylum seeker's credibility by establishing that the trauma she has suffered impedes her ability to recount the circumstances that prompted her flight to the United States.   Mental health evaluations also assist attorneys in determining if clients are competent to consent to representation, consult with their attorneys, and participate meaningfully in their cases.

4.      In May 2017, ICE stated for the first time in writing a policy that a telephonic medical evaluation required pre-approval—and relied on this policy to justify its previous revocation of access to STFRC by Caroline Perris, one of DPBP's legal assistants, who had facilitated one such consultation without pre-approval two months before this announcement.

5.      ICE's revocation of Ms. Perris's access to STFRC has significantly impeded the ability of DPBP and Shalyn Fluharty, DPBP's Managing Attorney, to provide effective legal representation of clients and potential clients detained at STFRC.   In addition to being short-staffed, Ms. Fluharty and her team are unable to arrange expedited telephonic mental health evaluations for clients.   In essence, ICE's new written policy places DPBP staff in the untenable position of having to choose between potentially compromising the needs of their clients by following ICE's new written policy, or putting themselves at risk of losing their access to STFRC by providing the legal advice and representation they consider to be in their clients' best interests.

6.      DPBP relies exclusively on mental health professionals who are willing to provide services free of charge and must work to accommodate the schedules and logistical needs of those mental health professionals.   Given limited staff capacity, Ms. Fluharty is frequently deterred from sacrificing the time required to coordinate telephonic mental health evaluations because ICE routinely fails to approve her requests in time for the evaluations to proceed as scheduled.

7.      Having exhausted administrative remedies, Plaintiffs file this lawsuit in a continuing effort to ensure that they can effectively represent the mothers and children detained at STFRC.   To this end, Plaintiffs seek a declaratory judgment confirming that ICE's stated policy of requiring pre-approval of telephonic mental health evaluations is contrary to law.   They

further seek an injunction prohibiting the continued implementation of this policy and mandating the reinstatement of Ms. Perris's access to STFRC.  While this dispute remains unresolved, families with bona fide asylum claims are being deported—placing their lives in jeopardy.

## PARTIES

8.      Plaintiff Dilley Pro Bono Project is an unincorporated association that provides *pro bono* legal services and undertakes advocacy on behalf of detained mothers and their children at STFRC near the city of Dilley, Frio County, Texas.  DPBP is a consortium of four non-profit corporations, the American Immigration Council (Council), the American Immigration Lawyers' Association (AILA), the Catholic Legal Immigration Network, Inc. (CLINIC), and Texas RioGrande Legal Aid (TRLA).  TRLA employs several people, including Plaintiff Shalyn Fluharty and Plaintiff Caroline Perris, to provide direct services to mothers and children detained at STFRC.

9.      Plaintiff Shalyn Fluharty, the Managing Attorney of DPBP, resides in Dilley, Texas.

10.      Plaintiff Caroline Perris, a legal assistant with DPBP, resides in Dilley, Texas. She works under the supervision of and on behalf of Plaintiff Shalyn Fluharty.

11.      Defendant U.S. Department of Homeland Security (DHS) is a federal executive agency responsible for, among other things, enforcing federal immigration laws, overseeing lawful immigration to the United States, and conducting screenings of asylum applicants.

12.      Defendant U.S. Immigration and Customs Enforcement (ICE) is a component of DHS.  ICE is the principal investigative arm of DHS and is charged with criminal and civil enforcement of the immigration laws.  ICE's primary duties include the investigation of persons

suspected to have violated the immigration laws and the apprehension, detention, and removal of noncitizens who are unlawfully present in the United States.

13.     Defendant John F. Kelly is sued in his official capacity as the Secretary of DHS. In this capacity, he is charged with enforcing and administering the immigration laws.  He oversees each of the component agencies within DHS, including ICE, and has ultimate authority over all policies, procedures, and practices relating to ICE facilities.  He is responsible for ensuring that all individuals held in ICE custody are detained in accordance with the Constitution and all relevant laws.

14.     Defendant Thomas D. Homan is sued in his official capacity as the Acting Director of ICE.  In that capacity, he has direct authority over all ICE policies, procedures, and practices relating to ICE facilities, including detention facilities for mothers and their children. He is responsible for ensuring that all individuals held in ICE custody are detained in accordance with the Constitution and all relevant laws.

15.     Defendant Daniel A. Bible is sued in his official capacity as the Field Office Director of ICE, San Antonio, Texas.  In that capacity, he has direct responsibility for policies, procedures, and practices relating to ICE detention facilities in the Central South Texas Area of Responsibility, including STFRC.  He is responsible for ensuring that all individuals held in ICE custody in the Central South Texas Area of Responsibility are detained in accordance with the Constitution and all relevant laws.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1346.  This action arises under the U.S. Constitution, the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*., and the Administrative Procedure Act (APA), 5

U.S.C. § 701, *et seq*.   Defendants have waived sovereign immunity for purposes of this suit

pursuant to 5 U.S.C. § 702. The Court has authority to grant declaratory relief under 28 U.S.C.

§§ 2201 and 2202.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because

Defendants DHS and ICE are headquartered in this District.

## STATUTORY AND REGULATORY BACKGROUND

18.     People fleeing violence in their home countries have a statutory right to seek

asylum in the United States.  8 U.S.C. § 1158(a)(1).

19.     For many, but not all, families detained at STFRC, ICE has chosen to initiate

expedited removal proceedings rather than regular removal proceedings.   The first step in

pursuing an asylum claim while in expedited removal proceedings is a Credible Fear Interview

(CFI).

20.     Each week at STFRC, Asylum Officers generally conduct between 100 and 500

CFIs.  Asylum-seekers subject to expedited removal are required to pass CFIs with federal

asylum officers before they may file formal asylum applications.  8 U.S.C. § 1225(b)(1)(B).

21.     Families subject to expedited removal are regularly detained without bond while

awaiting their CFIs.  8 C.F.R. § 1235.3(b)(4)(ii).  During this time, DPBP frequently has only

one day to prepare each family for their CFI.

22.     Families who receive positive credible fear determinations are usually released to

join relatives or friends within the United States while they pursue their asylum applications.

23.     Families who receive negative credible fear determinations may seek review by

an Immigration Judge.  Review must occur within 24 hours when practicable but no later than 7

days later.  8 C.F.R. § 1003.42(e).  The Immigration Judge may affirm or vacate the Asylum

Officer's negative credible fear determination. *Id.* § 1003.42(f). If the Immigration Judge affirms the negative credible fear determination, ICE works quickly to remove the family from the United States.

24.     At any time prior to the family's departure from the United States, the Asylum Officer retains discretion to reconsider a negative credible fear determination. 8 C.F.R. § 1208.30(g)(2)(iv)(A) ("The Service . . . may reconsider a negative credible fear finding that has been concurred upon by an immigration judge after providing notice of its reconsideration to the immigration judge.").

25.     Congress conferred a statutory right upon each person who is detained and subject to the CFI process to "consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process." INA, 8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. § 1235.3(b)(4)(i)(B) ("right to consult"). The U.S. District Court for the District of Columbia has construed this statutory right of consultation to attach before a credible fear interview takes place. *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 54 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).

26.     To implement the INA, DHS regulations provide that "[p]rior to the [CFI], the alien shall be given time to contact and consult with any person or persons of his or her choosing. Such consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained . . . ." 8 C.F.R. § 1235.3(b)(4)(ii).

27.     Consultation policies and procedures appear in ICE's "Standard Operating Procedures [for] Legal Access and Legal Visitation" at Family Residential Centers (FRCs), which are the facilities where mothers and children seeking asylum are detained. (Exhibit A.)

This document states, in relevant part, that FRCs will: "permit legal visitation seven days a week;" "allow each resident to meet privately with current or prospective legal representatives and their legal assistants;" ensure that conversations during legal visits are "confidential;" and "maintain a land-line telephone in each legal visitation room for use by attorneys and residents for legal visitation purposes relevant only to the specific visit." Any visitor who violates any visitation rule may face corrective action including visitation restrictions and/or suspension of future visitation privileges. However, the document also requires that these rules be distributed in writing and posted in specified locations.

28.     Consultation policies and procedures also appear in ICE's "Residential Standard [for] Visitation." (Exhibit B.) This document states, in relevant part:

> [E]ach facility shall develop procedures that liberally allow an opportunity for consultation visitation, in order to ensure compliance with statutory and regulatory requirements and to prevent delay . . . .  Given the time constraints, consultation by mail will generally not prove viable.

> The facility shall facilitate consultation visitation by telephone and face-to-face, and staff shall be sensitive to individual circumstances when resolving consultation-related issues.

> Consultation visitation shall be allowed during legal visitation hours and during general visitation hours; however, confidentiality shall be ensured only during legal visitation hours.

*Id.* ¶ 5.8(V)(11)(b) (available at https://www.ice.gov/detention-standards/family-residential) (last visited May 31, 2017).

29.     Consultation policies and procedures also appear in ICE's "Residential Standard [for] Telephone Access." (Exhibit C.)  This standard, which is separate from the visitation standard, requires facilities to provide "direct or free" telephone calls to "[l]egal representatives, to obtain legal representation, or for consultation, when a resident is subject to Expedited Removal."  *Id.* ¶ 5.7(V)(5) (available at https://www.ice.gov/detention-standards/family-

8

residential) (last visited May 31, 2017).  The standard further requires that restrictions on direct or free calls "must not unduly limit a resident's attempt to obtain legal representation."  *Id.*  The only delays in access to free telephone calls contemplated by the telephone access standard are when the calls are "limited by technology," and such technology-related delays cannot exceed 24 hours.  *Id.* ¶ 5.7(V)(5)(a)-(b).

30.     Policies and practices for in-person medical and/or mental health evaluations appear in ICE's "Residential Standard [for] Medical Care."  (Exhibit D.)  This document states, in relevant part:

**Examinations by Independent Medical Service Providers and Experts**

On occasion, medical and/or mental health examinations by a practitioner or expert not associated with [ICE] or the facility may provide a resident with information useful in administrative proceedings before the Executive Office for Immigration Review and [ICE].

If a resident seeks an independent medical or mental health examination, the resident or his or her legal representative shall submit to [ICE] a written request that details the reasons for such an examination. [ICE] shall approve the examination, as long as it would not present an unreasonable security risk.  If a request is denied, [ICE] shall advise the requester in writing of the rationale.

The facility shall provide a location for the examination but no medical equipment or supplies, and the examination must be arranged and conducted in a manner consistent with security and good order.

*Id.* ¶ 4.3(V)(26) (available at https://www.ice.gov/detention-standards/family-residential) (last visited May 31, 2017).  By stating that "[t]he facility shall provide a location for the examination but no medical equipment or supplies," ICE's "Residential Standard [for] Medical Care" makes clear that its pre-approval requirement for examinations applies only to in-person examinations.

31.     To implement ¶ 4.3(V)(26) of its medical care standard, ICE promulgated a form, effective on January 27, 2016, entitled "Independent Medical Service Provider and Expert Request."  (Exhibit E.)  This document states, in relevant part:

**Pre-Screening Requirements for Designation of Independent Medical Service Providers and Experts**

For safety and security of Family Residential Center (FRC) residents and staff, FRCs will require all prospective Legal **Visitors** (Independent Medical Service Provider or Expert) to pass pre-clearance/record checks seventy-two (72) hours prior to the scheduled **visit**.  The pre-clearance/record checks will include, but not [sic] limited to:  identity verification, current employment or educational status, certification of medical license, and arrest and criminal history, underlying the applicant's request for medical **visitor** designation.

*Id.* (emphasis added).

32.    By referring to "visitors" and the "scheduled visit," the Independent Medical Service Provider and Expert Request makes clear that it applies only to in-person medical visitors.  As used throughout ICE's "Standard Operating Procedures [for] Legal Access and Legal Visitation," and ICE's "Residential Standard [for] Visitation," the terms "visit" and "visitor" clearly refer to in-person visits and visitors.  For example, the "Standard Operating Procedures [for] Legal Access and Legal Visitation" regulate "visiting areas" and "Visitor's Food and Drink" and distinguish between telephone communications and visits.  (Exhibit A III.D-F ("Legal representatives and assistants may telephone the facility in advance of a visit . . . .").)  The requirements set forth in the Independent Medical Service Provider and Expert Request form are limited to in-person "visits" by individuals licensed or otherwise authorized by a state to provide medical or mental health care services.

33.    The Family Residential Standards described in the foregoing paragraphs, many of which are located on ICE's website at https://www.ice.gov/detention-standards/family-residential (last visited May 31, 2017), are publicly available.  The Standards described above generally begin with a "Purpose and Scope" that describes the rights and benefits that the Standard creates for detainees.  For example, ICE's "Residential Standard [for] Visitation" (Exhibit B) begins with the statement that "Residents will be able to maintain ties through

visitation with their families, the community, legal representatives, and consular officials, within the constraints of safety and good order."

34.     No written ICE policy promulgated before May 12, 2017 requires prior approval for mental health evaluations that are conducted telephonically.

## STATEMENT OF FACTS

### A.     The South Texas Family Residential Center

35.     In December 2014, ICE and Corrections Corporation of America, a for-profit corporation that operates private prisons and that rebranded as "CoreCivic" in October 2016, opened the South Texas Family Residential Center located in Frio County near the town of Dilley, Texas.  Unlike most ICE detention facilities, STFRC was not originally constructed to serve as an adult prison or jail.  Instead, STFRC was specifically designed and constructed by the Corrections Corporation of America, following ICE specifications, for the sole purpose of detaining mothers and their minor children.  STFRC detains this population in a secure facility, behind tall fences monitored by flood lights and surveillance cameras.  After visiting STFRC, Member of Congress Judy Chu stated that it "looked so much like the Japanese-American internment camps of World War II."  In December 2016, a state District Court in Travis County, Texas, ordered the Texas Department of Family and Protective Services to withdraw a rule permitting STFRC to be licensed as a child care facility because such a rule violates Texas statutes and "runs counter to the general objectives of the Texas Human Resources Code."

36.     As of October 2016, CoreCivic did not dispute that no mother or child has ever attempted to escape from STFRC.

37.     By statute and regulation, detention at STFRC is not supposed to be punitive. ICE's authority to detain families at STFRC does not arise from any criminal statute and is not

derived from the enforcement of any sentence for a crime.  Instead, the mothers and children held at STFRC are civil detainees who are facing potential removal from the United States through civil immigration enforcement proceedings.  ICE holds these mothers and children in detention centers through an exercise of its discretion.

38.     At STFRC, ICE has the capacity to detain up to 2,400 mothers and children, although the actual population usually varies between 200 and 1,500 detainees.  The cost to ICE to maintain STFRC does not fluctuate with the population.  ICE pays Corrections Corporation of America/CoreCivic the same amount regardless of how many mothers and children are detained at STFRC.

39.     Most families detained at STFRC consist of a mother and one child.

40.     During 2016, ICE detained approximately 11,302 children at STFRC with a median age just under 6.

41.     Almost all STFRC detainees are from El Salvador, Guatemala, and Honduras, countries with some of the highest violent crime rates in the world.

42.     The overwhelming majority of STFRC detainees served by DPBP have experienced severe forms of trauma, including child abuse, rape, incest, domestic violence, and the persecution of their loved ones.

43.     Most STFRC detainees communicate only in Spanish or in an indigenous language.

**B.     The Dilley Pro Bono Project**

44.     Since STFRC began detaining families in December 2014, various non-profit corporations have organized and operated a *pro bono* legal assistance project that eventually became known as the Dilley Pro Bono Project.

45.     The federal government has never created a public defender system for people in removal proceedings.  Families and individuals facing removal usually have extremely limited, if any, resources; generally do not speak English; and, if detained at STFRC or many other similar centers, are in remote locations with few lawyers nearby.  Accordingly, DPBP, which offers free, local legal services in Spanish, plays an indispensable role in ensuring that the families detained at STFRC understand and are adequately prepared for the various stages of their immigration proceedings that occur while they are in detention.

46.     In February 2017, DPBP's staff consisted of two full-time attorneys and four full-time legal assistants.  DPBP staff also supervised roughly eight to twenty rotating volunteers who were present on-site at STFRC each day.  DPBP staff are bilingual and specially trained on the nuances of expedited removal proceedings and asylum law, administration of DPBP's electronic client case management system, and DPBP's operating procedures.  Accordingly, DPBP staff are not easily replaced.  The absence of any of the six full-time staff imposes a severe strain on the remaining providers.

47.     DPBP provides numerous legal services to STFRC detainees prior to their CFIs, including:

       a.     group legal meetings orienting families to credible fear proceedings;

       b.     asserting fear on behalf of clients who wish to proceed with the CFI process;

       c.     securing mental health evaluations and other forms of evidence gathering;

       d.     interview preparation;

       e.     requesting appropriate language access during CFIs;

       f.     requesting release for clients who have an urgent need for medical attention; and

      g.    asserting claims for U.S. citizenship, legal permanent residence, or other forms of status that constitute a statutory bar to an individual's placement in expedited removal proceedings.

48.    DPBP provides numerous legal services to STFRC detainees subsequent to the issuance of a positive credible fear determination, including:

      a.    motions for custody redetermination;

      b.    requests for release without the condition of an ankle monitor;

      c.    representation during master calendar hearings; and

      d.    orientation regarding obligations upon release from detention.

49.    DPBP provides numerous legal services to STFRC detainees subsequent to issuance of a negative credible fear determination, including:

      a.    advising on legal options;

      b.    evidence gathering;

      c.    document drafting and filing;

      d.    requests for reconsideration or re-interview;

      e.    accompaniment and assistance before the Immigration Judge during a negative credible fear review; and

      f.    arranging for safe return to the extent possible and necessary.

50.    To the extent that DPBP staff are able to arrange mental health evaluations for particular clients, they must generally do so shortly after the need for such an evaluation is identified.  This is because of (i) the short time frames applicable to DPBP clients' cases, and (ii) the limited availability of *pro bono* mental health professionals, who frequently can offer telephone appointments, but only on short notice.

51.    The May 12, 2017 policy requiring ICE approval for telephonic mental health evaluations fails to specify any deadline by which ICE must respond to such a request.  In Plaintiffs' experience, ICE can take days or weeks to approve an "Independent Medical Service Provider and Expert Request."  (Exhibit E.)  That is in part because a single ICE officer is

responsible for responding to such requests; if that officer is unavailable, approval can be severely delayed.

52.     The legal services provided by DPBP staff, including attorney-client and legal assistant-client meetings with DPBP clients, are critical to ensuring effective representation of individuals detained pending CFIs or other immigration proceedings.  DPBP has provided legal consultation services to detainees according to ICE's rules without significant incident since December 2014.  To the extent that misunderstandings have arisen between ICE and DPBP, they have typically been resolved by informal discussion during periodic liaison meetings among stakeholders.

### C.     Revocation of Caroline Perris's License

53.     On January 15, 2017, DPBP participating organization TRLA hired Plaintiff Caroline Perris as a full-time employee and assigned her to work exclusively for DPBP. Ms. Perris is fluent in English and Spanish.

54.     TRLA pays Ms. Perris an annual salary specifically to work as a full-time legal assistant at STFRC under the supervision of DPBP Managing Attorney Shalyn Fluharty.  TRLA has paid Ms. Perris the same salary since her hire date.

55.     On January 15, 2017, ICE granted Ms. Perris a "license," as defined in 5 U.S.C. § 551(8), to provide legal services within STFRC.

56.     Between January 15 and March 3, 2017, Ms. Perris consistently worked long hours providing legal services at STFRC without incident.

57.     At 10:45 a.m. on March 3, 2017, DHS's Asylum Office informed Ms. Fluharty that it would not re-consider a negative credible fear determination issued for a DPBP client. Ms. Fluharty immediately advised Ms. Perris of the case outcome given Ms. Perris's prior work with

this particular client. Ms. Perris, working under Ms. Fluharty's supervision, decided that a telephonic mental health evaluation would benefit the client.

58.     Ms. Perris took immediate steps to arrange the mental health evaluation because ICE's written policies unequivocally provide that she and her client are not only allowed to telephone anyone for matters relevant to the representation, but they are allowed to do so confidentially.  (Exhibit A ¶¶ III.C.2., III.F.1, III.L.1; Exhibit C.)

59.     As of March 3, 2017, ICE had no written policy requiring approval of a telephonic mental health evaluation prior to conducting it.

60.     Even so, to avoid needless controversy, Ms. Perris submitted an evaluation request form (as in Exhibit E) to ICE several hours prior to the scheduled evaluation.

61.     Ms. Perris then facilitated a telephonic mental health evaluation of the DPBP client in order to gather evidence to support a request for reconsideration of the DPBP client's initial negative CFI determination by the Asylum Office.

62.     The physician who conducted the evaluation facilitated by Ms. Perris is Dr. Craig Katz, a professor of medicine at New York's Icahn School of Medicine at Mount Sinai Hospital in New York.

63.     The Asylum Office relied on Dr. Katz's evaluation to reverse its decision and release Ms. Perris's client and her child from detention, rather than deporting them.

64.     ICE did not respond to Ms. Perris's evaluation request for Dr. Katz until several weeks later, when it approved the request.

65.     On March 17, 2017, ICE permanently revoked Caroline Perris's right to visit STFRC based on her conduct on March 3, as described above.  (Exhibit F.)

66.     DPBP and Ms. Perris submitted a detailed appeal of ICE's revocation.

67.     DPBP held several discussions with ICE's Chief Counsel in attempts to resolve this dispute informally.

68.     On May 12, 2017, in response to DPBP's request that ICE reinstate Ms. Perris's access, ICE stated for the first time in writing that "a request for a telephonic medical evaluation [must be] made in advance of the evaluation, and the request [must be] approved prior to the evaluation taking place."  (Exhibit G.)  ICE cited this newly-announced rule as the justification for its March 3, 2017 decision prohibiting Ms. Perris from visiting STFRC.

69.     ICE's new written policy requiring pre-clearance for telephonic mental health evaluations is arbitrary and capricious.  On information and belief, ICE asserts a security justification for requiring pre-clearance for in-person visits because they involve the physician physically entering STFRC and may require the physician to bring medical equipment or supplies into STFRC.  However, a telephone call involves no physical entry by the physician. Accordingly, no similar security justification can exist for pre-screening telephone conversations with physicians.

70.     As set forth above, DHS's regulations and ICE's policies elsewhere allow detainees confidential access to telephones to call any person for purposes relevant to their cases. Indeed, ICE has installed land-line telephones in each attorney visitation room.  These land-line telephones may connect to any international or U.S.-based local, long-distance, or toll-free telephone number.  ICE does not require pre-approval for attorneys to make telephone calls from these phones to individuals who are not physicians, and the telephone system has no technological limitations that would make such pre-approval necessary.

**D.      Injuries Caused by ICE's Unlawful Policy, its Retroactive Enforcement of that Policy, and its Suspension of Ms. Perris**

71.      ICE's implementation and enforcement of an unlawful policy, and its resulting exclusion of Ms. Perris from STFRC, interferes with First Amendment and statutory rights of association and consultation that exist between detained immigrants and *pro bono* legal services providers, including Plaintiffs.

72.      *First*, ICE's unjustified suspension of Ms. Perris has caused a shortage of staffing at DPBP, rendering Ms. Fluharty and her team unable to complete crucial tasks for DPBP's clients and causing the level of service provided to DPBP's clients to decline.  In Ms. Perris's absence, DPBP clients who (in DPBP's judgment) required the attendance of a legal representative at their interviews with the Asylum Office have been forced to attend alone.  At least one client was removed because DPBP was unable to submit a motion to reconsider her negative credible fear determination as a result of the shortage in staffing.  The remaining members of DPBP's team are required to work more hours to make up for the staffing shortage, yet remain unable to complete critical tasks for each client.

73.      *Second*, as a result of ICE's illegal policy requiring prior approval for telephonic mental health evaluations (Exhibit G), DPBP attorneys must choose between putting themselves at risk of having their visitation rights permanently revoked by providing the legal assistance and advice they believe is in the best interests of their clients, including expedited confidential telephonic mental health evaluations—or potentially compromising their representation of their clients by seeking and waiting for prior approval.

74.      *Third*, as a result of ICE's illegal policy requiring prior approval for all telephonic mental health evaluations (Exhibit G), DPBP attorneys are deterred and chilled from exercising their First Amendment right to provide the legal assistance they believe is required.  That is

18

because DPBP attorneys recognize that ICE will not approve requests for mental health evaluations on short notice, and by the time ICE approves any given request, a detainee's CFI or related proceeding will likely have taken place. DPBP attorneys are reluctant to expend scarce resources seeking approval for expedited telephonic mental health evaluations that are unlikely to occur.

75. *Fourth*, because Ms. Perris's visitation rights were revoked on March 17, Ms. Perris has been prevented from associating with clients who sought her assistance before then; and Ms. Fluharty's association with those clients has been hindered by the absence of Ms. Perris.

76. ICE's revocation of Ms. Perris's visitation rights has caused DPBP partner TRLA to waste valuable resources every day that Ms. Perris, who is paid as a full-time employee, is unable to perform her contracted duties through no fault of her own, but rather due to ICE's unjustified exclusion of Ms. Perris from STFRC.

77. Plaintiffs incorporate all attached exhibits in full and for all purposes pursuant to FED. R. CIV. P. 10(c).

## INJUNCTIVE RELIEF

78. Plaintiffs are entitled to a preliminary and permanent injunction. Defendants have acted and threaten to act to deprive Plaintiffs and those they seek to represent of their constitutional and statutory rights. Plaintiffs have suffered irreparable injuries and the loss of fundamental associational rights and have been and will continue to be subjected to serious risks of these same irreparable harms as the result of ICE's actions. Plaintiffs have no plain, adequate, or speedy remedy at law.

## CAUSES OF ACTION

## COUNT ONE

### (Violation of Plaintiffs' First Amendment Rights of Association)

79.     The First Amendment of the U.S. Constitution guarantees Plaintiffs the right to communicate and associate with their clients and prospective clients who are seeking representation, to inform them about their legal rights, to discuss the possibility of legal representation, and to assist them with their legal claims in a confidential setting.

80.     ICE's decision to revoke Ms. Perris's visitation rights violates Plaintiffs' First Amendment rights to communicate and associate with their clients.

81.     ICE's actions have caused Plaintiffs to suffer injuries in fact.  DPBP is the only free legal services provider for mothers and children detained at STFRC.  ICE's actions undermine DPBP's mission to provide legal services for families detained at STFRC, and harm Plaintiffs by interfering with their First Amendment rights to associate and communicate with their clients and potential clients seeking representation.

82.     Defendants' actions also violate the First Amendment because they burden the constitutionally protected speech and association rights of third parties, including clients and potential clients of Plaintiffs, who are deprived of the opportunity to associate and communicate with DPBP.

83.     ICE's actions are the direct cause of Plaintiffs' injuries.

84.     As a result of Defendants' unconstitutional actions, Plaintiffs are entitled to the requested relief.

## COUNT TWO

### (Violation of Administrative Procedure Act, 5 U.S.C. § 706)

85.     The Administrative Procedure Act empowers this Court to issue all injunctive relief necessary to secure ICE's compliance with treaties, the Constitution, statutes, regulations, and ICE's own policies.  5 U.S.C. § 706(2); *Montilla v. INS*, 926 F.2d 162, 163-64 (2d Cir. 1991).

86.     ICE has taken the following final agency actions:

a.      ICE adopted an unlawful new written policy that requires ICE approval prior to any telephonic mental health evaluation sought by legal counsel for use in legal proceedings;

b.      ICE determined that Caroline Perris violated ICE policies by not seeking approval before coordinating a telephonic mental health evaluation of a detainee in connection with a request for reconsideration of that detainee's negative CFI determination by the Asylum Office; and

c.      ICE excluded Ms. Perris from STFRC by suspending, and refusing to reinstate, her visitation rights.

87.     ICE's final agency actions violate the Constitution, statutes, regulations, and policies referenced above because:

a.      The First Amendment to the U.S. Constitution guarantees to Plaintiffs the right to communicate and associate with detainees;

b.      Statutes, ICE regulations, and written ICE policies guarantee the right of in-person association between detainees and lawyers or legal assistants, subject to revocation only for violation of published ICE rules;

c.      The text of ICE's own prior policies limits the prior approval requirement to *in-person* mental health examinations conducted by a professional on site at a detention facility;

d.      It is arbitrary to require, and would be arbitrary to deny, a request for telephonic mental health evaluation, because ICE's own rules permit detainees and their lawyers to call anyone they choose for case-related purposes; and

21

     e.     To the extent that ICE's policies require pre-approval of, permit denial of, or practically prevent telephonic mental health evaluations, any such policy violates 8 U.S.C. § 1225(b)(1)(B)(iv) and 8 C.F.R. § 1235.3(b)(4)(ii), which guarantee detainees the right to consult any person they choose as they prepare for credible fear proceedings.

88.     ICE's final agency actions have caused Plaintiffs to suffer injuries in fact. In particular, those actions have undermined DPBP's mission to provide legal services for families detained at STFRC, and have harmed Plaintiffs by interfering with their First Amendment rights to associate with the mothers and children that they aim to serve.

89.     Additionally, Plaintiffs are permitted to vindicate the rights of clients and prospective clients of DPBP who are not able to consult with the sole provider of free legal services at STFRC.

90.     The interests that Plaintiffs seek to protect are within the zone of interests regulated by the applicable provisions of the Constitution and the Immigration and Nationality Act.

91.     ICE's final agency actions are the direct cause of Plaintiffs' injuries.

92.     Plaintiffs' requested relief would redress Plaintiffs' injuries.

93.     Plaintiffs have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint.

## PRAYER FOR RELIEF

94.     Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, policies, and practices of Defendants, as alleged herein, unless Plaintiffs are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the U.S. Constitution and the laws of the United States.

WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

(a) pursuant to D.D.C. Local Rule 7(n)(1), order that ICE immediately produce the complete administrative record showing all documents that ICE relies upon to defend its actions challenged in this lawsuit, including without limitation all documents related to:

> (1) suspension of Caroline Perris from STFRC;

> (2) changes in ICE's STFRC consultation requirements since January 2017; and

> (3) reasons for changes in such consultation requirements.

(b) an order that ICE immediately reinstate Caroline Perris's STFRC visitation license;

(c) a preliminary and permanent injunction prohibiting ICE from enforcing its May 12, 2017 written policy concerning pre-approval for telephonic mental health evaluations;

(d) a preliminary and permanent injunction prohibiting ICE from issuing unnecessary restrictions that significantly interfere with in-person association between detainees and their lawyers or legal assistants;

(e) an order that ICE pay Plaintiffs' reasonable litigation costs and attorney's fees; and

(f) all other relief that the Court deems just and proper to ensure that ICE has in place policies, practices, and procedures preserving Plaintiffs' access to clients and prospective clients seeking representation at STFRC.

June 1, 2017

Respectfully submitted,

/s/ Melissa Crow

Melissa Crow (DC Bar No. 453487)
American Immigration Council
1331 G Street, N.W., Suite 200
Washington, DC  20005
(202) 507-7523

/s/ Amanda Flug Davidoff

Amanda Flug Davidoff (DC Bar No.
978033)
Lucas Lallinger (DC Bar No. 1046778)
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC  20006
(202) 956-7500

/s/ Rebecca Scholtz

Rebecca Scholtz (*pro hac vice* motion
pending)
Catholic Legal Immigration Network, Inc.
c/o University of St. Thomas
Interprofessional Center
30 South 10th Street
Minneapolis, MN  55403
(651) 962-4833

Richard H. Klapper (*pro hac vice* motion
pending)
Veronica W. Ip (*pro hac vice* motion
pending)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004
(212) 558-4000

*Attorneys for Plaintiffs*