**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DILLEY PRO BONO PROJECT; CAROLINE PERRIS; and SHALYN FLUHARTY,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. DEPARTMENT OF; HOMELAND SECURITY; JOHN F. KELLY, Secretary of Homeland Security, in his official capacity; THOMAS D. HOMAN, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; and DANIEL A. BIBLE, Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity,<br><br>*Defendants.* | Civil Action No.<br>1:17-cv-_____________ |

**APPLICATION FOR A PRELIMINARY INJUNCTION**

Seven days a week, attorneys and legal assistants working for the Dilley Pro Bono Project (DPBP) walk through metal detectors, have their possessions X-rayed, relinquish their cell phones, and then enter the legal visitation trailer at the South Texas Family Residential Center (STFRC) to meet with their clients. Each attorney and legal assistant has already been screened and pre-approved by ICE to engage in contact visits, and ICE provides them with telephones and legal visitation rooms so that they and their clients—detained mothers and their children—can make confidential telephone calls for case-related purposes. By statute and regulation, detainees subject to expedited removal have a right to use these meetings and telephones to "contact and consult with any person or persons of [their] choosing" to prepare for their Credible Fear Interviews (CFIs). On May 12, 2017, however, ICE issued a new written policy restricting communications that violates these statutes and regulations and

unconstitutionally interferes with the efforts of the DPBP legal team to represent their detained clients in credible fear proceedings.

Plaintiff Caroline Perris is a legal assistant who, between January 15, 2017 and March 17, 2017, provided free legal services to roughly two dozen detained families daily at STFRC. On March 3, 2017, Ms. Perris, under the direction of DPBP Managing Attorney Shalyn Fluharty, used the telephone that ICE provided for case-related telephone calls to facilitate a mental health evaluation for use in a detainee's credible fear proceeding. Two weeks later, ICE revoked Ms. Perris's right to access STFRC, ostensibly because she had not obtained ICE's pre-approval for the March 3 telephonic evaluation. DPBP appealed this decision on the basis that the provision of the Family Residential Standards requiring ICE pre-approval governs only in-person medical examinations, not telephonic evaluations. On May 12, 2017, DPBP's efforts to resolve this dispute informally failed when ICE announced in writing, for the first time, a policy requiring pre-approval of telephonic mental health evaluations.

Ms. Perris, Ms. Fluharty and DPBP now seek a preliminary injunction to (i) reinstate Ms. Perris's access to STFRC and (ii) prohibit ICE from enforcing its May 12, 2017 written policy requiring pre-approval of telephonic mental health evaluations, pending a final decision in this case. This is the "last uncontested status which preceded the pending controversy," which is the *status quo* that preliminary injunctions are intended to preserve. *Bldg. and Constr. Trades Dep't, AFL-CIO* v. *Allbaugh*, 172 F. Supp. 2d 67, 76 (D.D.C. 2001) (collecting cases); *accord Mississippi Power & Light Co.* v. *United Gas Pipe Line Co.*, 609 F. Supp. 333, 343 (S.D. Miss. 1984) ("The status quo to be preserved by a preliminary injunction is universally defined as the last uncontested status which preceded the pending controversy."), *aff'd*, 760 F.2d 618 (5th Cir. 1985).

## BACKGROUND

Plaintiff Caroline Perris resides in Dilley, Texas. On January 15, 2017, Texas RioGrande Legal Aid, Inc. (TRLA)—a participating organization in Plaintiff Dilley Pro Bono Project (DPBP)—hired Ms. Perris to work exclusively for DPBP as a legal assistant. (Perris Declaration ¶ 1.) TRLA pays Ms. Perris an annual salary to work as a full-time legal assistant at STFRC, located in Dilley, Texas, where ICE detains up to 2,400 mothers and children. (Perris Declaration ¶ 1.[1]) Ms. Perris works under the supervision of and on behalf of DPBP's Managing Attorney, Plaintiff Shalyn Fluharty. (Fluharty Declaration ¶ 3; Perris Declaration ¶ 1.)

### A. Statutes, Regulations, and ICE Policies Applicable to DPBP and its Clients

Many, but not all, DPBP clients at STFRC are subject to expedited removal. (Fluharty Declaration ¶ 6; Perris Declaration ¶ 4.) These families are detained without bond while awaiting a "credible fear" interview before the Asylum Office—an interview to determine whether the family would face a credible fear of persecution if returned to their home country. A mental health evaluation can be a critical piece of evidence for DPBP clients in this process. (Fluharty Declaration ¶ 10; Perris Declaration ¶ 9.) Most STFRC detainees served by DPBP have experienced severe forms of trauma, including child abuse, rape, incest, domestic violence, and the persecution of their loved ones. (Fluharty Declaration ¶ 11.) As a result of such trauma, clients are frequently unable to express themselves and their fears before the Asylum Office. A mental health evaluation can explain why the client was previously unable to articulate the reasons she fled to the United States and fill in important missing information that justifies a positive credible fear determination. (Fluharty Declaration ¶¶ 10-12; Perris Declaration ¶ 8.)

---

[1] "Perris Declaration" refers to the June 1, 2017 Declaration of Caroline Perris, filed herewith. "Fluharty Declaration" refers to the June 1, 2017 Declaration of Shalyn Fluharty, filed herewith. "Ex. __ refers to Exhibits to the Fluharty Declaration.

DPBP typically has only one day to prepare each family for their interview. (Fluharty Declaration ¶ 6.) Families who receive a determination that they do have a credible fear of persecution upon returning to their home countries may be released; families who do not (i.e. those who receive a so-called "negative credible fear determination") may seek review by an Immigration Judge. Review must occur within 24 hours when practicable, but no later than 7 days later. 8 C.F.R. § 1003.42(e). Given these compressed timeframes, in providing legal services to its clients, DPBP frequently must arrange for mental health evaluations, if appropriate, shortly after the need for such an evaluation is identified, and sometimes within several hours. (Fluharty Declaration ¶¶ 6, 8, 12-14; Perris Declaration ¶ 12.)

Under the Immigration and Nationality Act (INA), each person who is detained while awaiting a credible fear interview may "consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process." INA, 8 U.S.C. § 1225(b)(1)(B)(iv). To implement the INA, U.S. Department of Homeland Security regulations provide that "[p]rior to the [CFI], the alien shall be given time to contact and consult with any person or persons of his or her choosing." 8 C.F.R. § 1235.3(b)(4)(ii). The language of the regulation is notable in two respects: It does not permit DHS to impose any limitations on whom the detained person may consult, and it requires DHS to let such consultation take place *prior* to the CFI.[2]

In accordance with these provisions, ICE implemented "Standard Operating Procedures [for] Legal Access and Legal Visitation" that apply to STFRC and all other ICE

2 *Am. Immigration Lawyers Ass'n* v. *Reno*, 18 F. Supp. 2d 38, 54 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).

facilities that detain families. These procedures require STFRC to "permit legal visitation seven days a week;" "allow each resident to meet privately with current or prospective legal representatives and their legal assistants;" ensure that such conversations during legal visits are "confidential;" and "maintain a land-line telephone in each legal visitation room for use by attorneys and residents for legal visitation purposes relevant only to the specific visit." (Ex. A.) Other ICE procedures require STFRC to "liberally allow an opportunity for consultation visitation, in order to ensure compliance with statutory and regulatory requirements and to prevent delay" and to allow consultation visitation "during legal visitation hours." (Ex. B.)

Pre-CFI consultation policies and procedures also appear in ICE's "Residential Standard [for] Telephone Access." (Ex. C.) This standard, which is separate from the visitation standard, requires facilities to provide "direct or free" telephone calls to "[l]egal representatives, to obtain legal representation, or for consultation, when a resident is subject to Expedited Removal." The standard further requires that restrictions on direct or free calls "must not unduly limit a resident's attempt to obtain legal representation." The only delays in access to free telephone calls contemplated by the telephone access standard are when the calls are "limited by technology," and such technology-related delays cannot exceed 24 hours.

Nothing about the above-cited statutes and regulations, nor anything about ICE's pre-May 17, 2017 written policies, permitted ICE to require advance notice or approval before permitting DBPB's legal team to facilitate a telephonic mental health evaluation during legal visitation in preparation for a credible fear interview. While there is a procedure for obtaining pre-approval for "Examinations by Independent Medical Service Providers and Experts," this procedure applies by its terms only to in-person examinations. (Ex. D, E.)

**B. The Suspension of Ms. Perris**

On January 15, 2017, ICE granted Ms. Perris a license, as defined in 5 U.S.C. § 551(8), to provide legal services within STFRC. (Perris Declaration ¶ 2.) Between January 15 and March 3, 2017, Ms. Perris consistently worked long hours providing legal services at STFRC without incident. (Perris Declaration ¶ 2.) On March 3, 2017, Ms. Perris was notified that a DPBP client received a negative credible fear determination, and was subject to imminent deportation. (Perris Declaration ¶¶ 7-8.) In connection with a review of that initial negative credible fear determination, Ms. Perris, under Ms. Fluharty's direction, worked to secure additional evidence to support a Request for Reconsideration and Re-Interview in the Alternative, including by obtaining a telephonic mental health evaluation for the client. (Perris Declaration ¶ 8.) The medical evaluation was indispensable to DPBP's client: in reliance on that mental health evaluation secured by Ms. Perris, the Asylum Office reversed its decision and released the client to relatives in the United States. (Perris Declaration ¶¶ 14-15.)

Ms. Perris's actions were permitted by statute, regulation, and ICE's policies in place on March 3, 2017. Nevertheless, on March 17, ICE revoked Ms. Perris's right to visit STFRC on the grounds that she had not obtained ICE pre-approval for the March 3 telephonic evaluation. (Fluharty Declaration ¶ 23; Perris Declaration ¶ 16.) On May 12, 2017, after DPBP pointed out that pre-approval was not required for a telephonic evaluation, ICE set forth in writing, for the first time, a policy indicating that telephonic mental health evaluations require pre-approval by ICE. (Fluharty Declaration ¶ 23; Perris Declaration ¶ 16.) As of the date of filing, Ms. Perris's visitation rights remain revoked. ICE stated that it will not reinstate Ms. Perris's visitation rights without assurance from DPBP that DPBP and its staff will obtain prior approval for all future telephonic mental health evaluations. (Fluharty Declaration ¶ 23.)

### C. Injury Caused by Defendants' Actions

As a result of Defendants' actions, Ms. Perris has been prevented from associating with clients and prospective clients. (Perris Declaration ¶ 18.) Ms. Fluharty's association with those clients has also been hindered by the absence of Ms. Perris. (Fluharty Declaration ¶ 25.)

ICE's new written policy has also constrained and chilled the relationship between DPBP attorneys and their clients in other ways. ICE's suspension of Ms. Perris caused a shortage of staffing at DPBP—which has just six full-time employees—rendering Ms. Fluharty and her team unable to complete crucial tasks for DPBP's clients and reducing the level of service provided to DPBP's clients. (Fluharty Declaration ¶¶ 3, 25-28.) More fundamentally, DPBP attorneys now must choose between putting themselves at risk of having their visitation rights permanently revoked by providing the legal assistance and advice they believe is in the best interests of their clients—including conducting expedited confidential telephonic mental health evaluations in some cases—or potentially compromising their representation of their clients by seeking and waiting for prior approval. (Fluharty Declaration ¶ 29.) Indeed, DPBP attorneys are deterred from seeking approval for mental health evaluations that must occur, if at all, on an expedited timeframe. That is because these attorneys recognize that ICE will not approve such requests on short notice, and they are reluctant to expend scarce resources seeking approval for expedited telephonic mental health evaluations that are unlikely to occur. (Fluharty Declaration ¶ 29.)

## ARGUMENT

### I. Plaintiffs Have Standing to Bring this Suit

To establish Article III standing, a plaintiff must have suffered an "injury in fact" that is "fairly traceable" to the conduct complained of, and there must be a likelihood that the injury will be "redressed by a favorable decision" of the court. *Lujan* v. *Defenders of Wildlife*,

504 U.S. 555, 61 (1992); *see also Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014).

All Plaintiffs have standing in their own right under *Lujan*. Plaintiffs Caroline Perris and Shalyn Fluharty have each suffered an injury in fact because ICE's May 12, 2017 written policy and revocation of Ms. Perris's visitation rights violated their First Amendment rights of association. *See* Section II.A.1, *infra*. Likewise, DPBP has suffered an injury in fact because ICE's suspension of Ms. Perris's visitation rights has inhibited its daily operations. Without question, these injuries are traceable to ICE's new May 12 written policy and revocation of Ms. Perris's visitation rights at STFRC. This Court has the power to redress Plaintiffs' injuries by ordering ICE to reinstate Ms. Perris's visitation rights; prohibiting ICE from enforcing its May 12, 2017 written policy concerning pre-approval for telephonic mental health evaluations; and prohibiting ICE from issuing unjustified restrictions on in-person association between detainees and their lawyers or legal assistants.

Plaintiff DPBP also has standing as an association to sue on behalf of its member, TRLA. An organization has standing to sue in its members' stead when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt* v. *Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see also United Food & Commercial Workers Union Local 751* v. *Brown Grp., Inc.*, 517 U.S. 544, 546 (1996). TRLA's economic injury as a result of Ms. Perris's inability to work is "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources"—and therefore confers standing on TRLA. *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 379 (1982). The associational freedoms

DPBP seeks to protect in this lawsuit are germane to its interests in providing pro bono legal assistance to families detained at STFRC. And TRLA's participation is not required, because "the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of Am.* v. *Brock*, 477 U.S. 274, 288 (1986) (citations omitted); *see also Ctr. for Sustainable Econ*. v. *Jewell*, 779 F.3d 588, 597-98 (D.C. Cir. 2015) (where plaintiff's petition turns on whether an agency complied with statutory obligations and the "relief it seeks is invalidation of agency action," participation of organizational members is not necessary).

Last, all Plaintiffs have standing to bring claims on behalf of the injured detainees, because Plaintiffs satisfy the test for third party standing: "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute;" (2) "the litigant must have a close relation to the third party;" and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Lepelletier* v. *F.D.I.C*., 164 F.3d 37, 43 (D.C. Cir. 1999) (citing *Powers* v. *Ohio*, 499 U.S. 400, 411 (1991)). Plaintiffs' injuries are set forth above; and they have a "close relation" to the detainees as their legal advocates and confidential advisors. There is also a significant "hindrance" to detainees' ability to protect their own interests, because the detainees who are most affected by ICE's unlawful action are those women and children who are unable to consult effectively with their mental health providers and attorneys. Because they are at risk of imminent deportation, such detainees face a significant disincentive to oppose the government's policies through formal legal action—namely, fear of retaliation.

Plaintiffs also have prudential standing because the associational interests that they seek to protect are "arguably within the zone of interests to be protected or regulated by the

statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Organizations, Inc.* v. *Camp*, 397 U.S. 150, 153 (1970); *see Bank of America Corp.* v. *City of Miami,* 581 U.S. ___, slip op. at 5-6 (May 1, 2017).[3]

## II. All Factors Weigh in Favor of Preliminary Injunction

Courts "consider four factors when deciding whether to grant a preliminary injunction: whether the plaintiff will be irreparably harmed if the injunction does not issue; whether the defendant will be harmed if the injunction does issue; whether the public interest will be served by the injunction; and whether the plaintiff is likely to prevail on the merits." *Univ. of Tex.* v. *Camenisch*, 451 U.S. 390, 392 (1981). These factors "interrelate on a sliding scale and must be balanced against each other." *Davenport* v. *Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999). "A district court must balance the strengths of the requesting party's arguments in each of the four required areas." *Chaplaincy of Full Gospel Churches* v. *England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* Even so, "[i]t is particularly important for the movant to demonstrate a likelihood of success on the merits." *Taseko Mines Ltd.* v. *Raging River Capital*, 185 F. Supp. 3d 87, 91 (D.D.C. 2016). Here, all four factors weigh strongly in favor of the preliminary injunction that Plaintiffs seek.

---

[3] For purposes of third party standing, the interests to be considered under a "zone of interest" analysis are those of the third party rather than the litigant. *Haitian Refugee Ctr.* v. *Gracey,* 809 F.2d 794, 811-12 (D.C. Cir. 1987). The third parties at issue here, the detainees, fall squarely within the zone of interests contemplated by 8 U.S.C. § 1225(b)(1)(B)(iv).

### A. Plaintiffs Are Likely to Succeed on the Merits of their Claims Because ICE's New Written Policy Violates the Constitution and the Plain Text of a Statute, a Regulation, and ICE's own Prior Policies.

ICE revoked Ms. Perris's visitation rights because Ms. Perris facilitated a March 3, 2017 telephonic mental health evaluation for use in a request for reconsideration of a detainee's initial negative CFI determination, and did so prior to receiving ICE's decision on her request to approve the evaluation. (Fluharty Declaration ¶ 23; Perris Declaration ¶ 16.) After DPBP pointed out that no statute, regulation, or written ICE policy in existence on March 3 required pre-approval for telephonic mental health evaluations, on May 12, 2017, ICE announced a new written policy that purports to require such pre-approval. The Constitution, the INA, its implementing regulations, and ICE's own written policies preclude ICE from restricting access to telephonic mental health evaluations in this way. Indeed, the INA and its regulations guarantee detainees the right to speak to anyone they wish as they prepare for credible fear proceedings.[4]

#### 1. Plaintiffs Are Likely to Succeed on the Merits of their First Amendment Claims.

Plaintiffs are likely to succeed in proving their claims under the First Amendment of the Constitution because ICE's written pre-approval policy for telephonic mental health evaluations, and its suspension of Ms. Perris pursuant to this purported policy, abridge Plaintiffs' First Amendment rights to associate with their clients at STFRC.

The Supreme Court has "recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of

---

4 Plaintiffs have third-party standing to bring their claims on behalf of women and children detained at STFRC. *See supra* Section I.

association of this kind as an indispensable means of preserving other individual liberties." *Roberts* v. *U.S. Jaycees*, 468 U.S. 609, 618 (1984). The Petition Clause of the First Amendment, which guarantees access to the courts, prohibits unreasonable interference with communications between incarcerated clients and their attorneys. *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) ("[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid."), *overruled on other grounds, Thornburgh* v. *Abbott*, 490 U.S. 401 (1989); *Orantes-Hernandez* v. *Smith*, 541 F.Supp. 351, 384 (C.D. Cal. 1982) (striking down limitations on visitation between immigration detainees and attorneys). Plaintiffs, as pro bono legal service providers for detainees at STFRC, each enjoy First Amendment rights to associate with their clients, and to provide their clients with confidential legal advice based on Plaintiffs' own judgment.

ICE will likely rely on *Turner* v. *Safley*, 482 U.S. 78, 89 (1987), to argue that it can infringe on Plaintiffs' First Amendment associational rights to the extent such restrictions are "reasonably related to legitimate penological interests" at STFRC. However, *Turner* is not the appropriate standard for evaluating restrictions on legal communications even in a regular jail. *See Procunier*, 416 U.S. at 419; *Am. Civil Liberties Union Fund of Michigan* v. *Livingston Cty.,* 796 F.3d 636 (6th Cir. 2015) (attorneys and inmates have a protected interest in maintaining the confidentiality of communications relating to a legal matter); *In re Primus,* 436 U.S. 412, 432 (1978) ("The First and Fourteenth Amendments require a measure of protection for 'advocating lawful means of vindicating legal rights,' including 'advis[ing] another that his legal rights have been infringed and refer[ring] him to a particular attorney or group of attorneys . . . for assistance.'") (quoting *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 434, 437 (1963)); *Sturm* v. *Clark*,

835 F.2d 1009, 1014 (3d Cir. 1987) ("Although plaintiff's claim is made in the context of a penal ambience, we must evaluate it in light of conventional first amendment doctrine, and not in light of the less demanding standard involving only prisoners' rights.").

Moreover, *Turner*, which assesses restrictions in light of "penological interests," 482 U.S. at 89, is a poor fit for a civil detention facility like STFRC. The government describes STFRC as a "Family Residential Center" rather than a prison or jail, and detains mothers and minor children there pursuant to proceedings that are "civil and non-punitive in purpose." *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Wong Wing v. United States*, 163 U.S. 228, 237 (1896) (prohibiting immigration commissioner from sentencing Chinese immigrant to hard labor pending deportation). The D.C. Circuit has never applied *Turner* to this context, and other circuits have held that *Turner* must be narrowed for civil detention to reflect "the different legitimate interests that governments have with regard to prisoners as compared with civil detainees." *Brown* v. *Phillips*, 801 F.3d 849, 853 (7th Cir. 2015); *Pesci* v. *Budz*, 730 F.3d 1291, 1297 (11th Cir. 2013) (["T]he 'legitimate penological interests' highlighted by the Supreme Court in *Turner* are not coextensive with the legitimate interests found in the civil detention context."); *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (individual detained pending civil adjudication "is entitled to protections at least as great as those afforded to a civilly committed individual and at least as great as those afforded to an individual accused but not convicted of a crime.") (citations omitted). As the Supreme Court has recognized, civil detainees, "[p]ersons who have been involuntarily committed[,] are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg* v. *Romeo*, 457 U.S. 307, 321–22 (1982).

Because this case involves the First Amendment rights of attorneys to engage in professional representation of clients at STFRC, the Court should apply the "unjustifiabl[e] obstruct[ion] of professional representation" standard of *Procunier* to Plaintiffs' First Amendment claims. Under this standard, ICE's pre-approval requirement must fail because it forces DPBP attorneys to make the untenable choice between putting themselves at risk of having their visitation rights permanently revoked by providing the legal assistance and advice they believe is in the best interests of their clients, or potentially compromising their representation of their clients by seeking and waiting for prior approval before proceeding with a mental health evaluation. (Fluharty Declaration ¶ 29.)

Even under the excessively deferential *Turner* standard, ICE's pre-approval requirement lacks a rational connection to ICE's stated interest, and is therefore invalid. *See Turner*, 482 U.S. at 90. Under *Turner*, four factors determine whether a restriction is "reasonably related" to a legitimate penological interest: (1) whether there is a "valid, rational connection" between the regulation and a legitimate interest put forward to justify the regulation; (2) whether "there are alternative means of exercising the right" in question for prisoners; (3) whether and what impact the use of the right will have on guards, other inmates, and prison resources; and (4) whether there are alternatives available to the prison. *Id*. at 90. The first factor is most important; where the "connection between the regulation and the asserted goal is . . . arbitrary or irrational" the "regulation cannot be sustained." *Id*. at 89-90; *Ashker* v. *Cal. Dep't of Corr*., 350 F.3d 917, 922 (9th Cir. 2003) ("[I]f the prison fails to show that the regulation is rationally related to a legitimate penological objective, we do not consider the other factors.").

ICE's pre-approval requirement for telephonic evaluations fails right out of the gate, because there is no "valid, rational connection" between the new written policy and any legitimate interest at STFRC. ICE's only stated interest for requiring pre-approval for telephonic mental health evaluations is a vague, poorly-articulated security rationale: to protect the "safety, security, and good order" of STFRC. (Ex. F.) Yet the INA, accompanying regulations, and ICE's own rules allow for detainees to consult telephonically with any person or persons for case-related purposes, without pre-approval. At STRFRC, ICE has installed land-line telephones in each visitation room that are capable of dialing any U.S.-based local, long-distance, or toll-free number. (Ex. C.) ICE does not require pre-approval for attorneys and legal staff to make telephone calls from these phones to any type of person except a mental health professional conducting a mental health evaluation, and the telephone system has no technological limitations that would make such pre-approval necessary. (Ex. C.)

Accordingly, carving out a lone exception to these generally permissive rules could only be justified under *Turner* if mental health professionals conducting mental health evaluations posed special security risks above and beyond those posed by other types of telephone calls—including calls to other types of people and calls to mental health professionals for purposes other than a mental health evaluation. ICE has not shown and cannot show how telephonic mental health evaluations pose any threat at all, much less any greater security threat to STFRC than do any other telephone calls. "Arbitrary or irrational . . . regulation[s] cannot be sustained." 482 U.S. at 89-90; *see also Beard* v. *Banks*, 548 U.S. 521, 535 (2006) ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."); *Allen* v. *Coughlin*, 64 F.3d 77, 80-81 (2d Cir. 1995) (challenged policy of prohibiting prisoners from receiving newspaper clippings in the mail was

not rationally related to governmental interest in preventing "dissemination of inflammatory material," because prisoners could receive inflammatory personal letters and subscribe to newspapers directly); *Monmouth Cty. Corr. Inst. Inmates* v. *Lanzaro*, 834 F.2d 326, 328 (3d Cir. 1987) (security concerns had no logical connection to prison's restrictions on providing abortions to female prisoners, because officials did not apply such restrictions to other medical procedures); *Cline* v. *Fox*, 319 F. Supp. 2d 685, 692-95 (N.D.W.Va. 2004) (prison policy irrational where it banned all books containing sexual depictions, including *Sophie's Choice* and the works of John Updike, but permitted sexually explicit magazines including *Playboy* and *Maxim*).

Because the pre-approval requirement is arbitrary and irrational, the court need not go further. *See Ashker*, 350 F.3d at 922.[5] ICE's written pre-approval policy, which unconstitutionally abridges Plaintiffs' First Amendment associational rights, is not rationally related to a legitimate interest at STFRC and therefore fails even the most deferential legal standard that could be argued to apply. As a result, Plaintiffs are likely to succeed on the merits of their First Amendment claims.

---

[5] Nevertheless, consideration of the other *Turner* factors yields the same result. *Turner's* second factor asks whether Plaintiffs and detainees have an alternate means of exercising their right to consultation. As described above, in many cases, because of time constraints, the only practical mental health evaluation option for legal services providers is to arrange expedited telephonic evaluations. (Fluharty Declaration ¶¶ 8, 12.) As to the final two factors, allowing telephonic access to mental health evaluations without pre-approval will have no meaningful impact on guards, other inmates or prison resources, and ICE maintains a clear alternative to the new written policy; namely, allowing telephonic access to mental health evaluations without pre-approval, as is permitted for all other detainee telephone calls.

**2. Plaintiffs Are Likely to Succeed on the Merits of their APA Claims.**

The Administrative Procedure Act (APA) empowers this Court to issue all injunctive relief necessary to secure ICE's compliance with treaties, the Constitution, statutes, regulations, and ICE's own policies. 5 U.S.C. § 706(2); *Montilla* v. *INS*, 926 F.2d 162, 163-64 (2d Cir. 1991). Plaintiffs are likely to succeed because ICE's new written policy violates Plaintiffs' constitutional rights, and is therefore unenforceable. *See supra* Section II.A.1. In addition, for the reasons set forth below, this Court should find, pursuant to its authority under the APA, that ICE's May 12 written policy violates the plain text of the statute and regulation governing detainees' consultation right, as well as ICE's own policies pertaining to the same issue.

a. By Statute and Regulation, ICE Cannot Require Burdensome and Time Consuming Pre-Approvals for Telephonic Mental Health Evaluations.

Under the INA, a detainee preparing for a credible fear interview "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General." 8 U.S.C. § 1225(b)(1)(B)(iv). This statutory language could not be more clear: detainees engaged in the credible fear process "may consult with" any person of their choosing, either "prior to" the CFI or in "any review thereof." This consultation right necessarily includes consultation with mental health professionals.[6]

[6] The regulation is even more explicit, providing that detainees "shall be given time to contact and consult with any person," and ordering that this occur "[p]rior to" the credible fear interview. 8 C.F.R. § 1235.3(b)(4)(ii) ("Prior to the interview, the alien shall be given time to contact and consult with any person or persons of his or her choosing."). In other words, a detainee cannot be forced, by procedural hurdles, to forfeit the consultation right. *Id.* The regulation also uses the mandatory word "shall"—"[s]uch consultation shall be made available"—in accordance with each facility's procedures. *Id*;

As a practical matter, imposing a pre-approval requirement before telephone conversations are permitted amounts to a denial of, or significant limitation of, the statutory right to consultation. Many DPBP clients are in expedited removal proceedings, and their cases move quickly. (Fluharty Declaration ¶¶ 8, 12.) While ICE reviews requests for telephonic mental health evaluations, a detainee may be forced to seek review or reconsideration of a negative credible fear determination—without the benefit of consultation. This amounts to an impermissible denial of rights guaranteed by statute and regulation. *See Cuozzo Speed Techs., LLC* v. *Lee,* 136 S. Ct. 2131, 2142 (2016) ("Where a statute is clear, the agency must follow the statute."); *Individual Reference Servs. Grp., Inc*. v. *F.T.C*., 145 F. Supp. 2d 6, 26 (D.D.C. 2001), *aff'd sub nom*. *Trans Union LLC* v. *F.T.C.*, 295 F.3d 42 (D.C. Cir. 2002) ("[W]hen a statute is clear and unambiguous, consideration of administrative interpretation contrary to such language is inappropriate; the agency cannot by its interpretation, override the congressional will as memorialized in the statutory language.").

Apart from vague references to the "safety, security, and good order" of STFRC (Ex. F), ICE has never identified any interest that it is protecting through ICE's intrusions on the detainees' rights to representation and counsel's right to provide effective representation. As a matter of fact, the onerous requirement that each telephonic mental health evaluation be pre-approved does nothing to improve the safety, security, or good order of STFRC. ICE's interest in prescreening telephone calls is far less weighty than its interest in prescreening in-person visitors: on a telephone call, for example, it is not possible for the person on the other end of the telephone line to provide contraband to a detainee. Moreover, to the extent ICE asserts a security

---

*see also Lopez* v. *Davis*, 531 U.S. 230, 241 (2001) ("shall" prescribes a "discretionless obligation").

interest in prescreening telephone calls, it must do so in a manner consistent with the binding statute and regulations permitting detainees to consult with "any person or persons of [their] choosing" prior to the CFI or any review thereof. *See* 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 1235.3(b)(4)(ii).

b. ICE Cannot Violate its Rules that Affect the Rights of Individual Detainees, Lawyers, and Organizations.

It is black letter law that "agencies may not violate their own rules and regulations to the prejudice of others." *United Space All., LLC* v. *Solis*, 824 F. Supp. 2d 68, 82 (D.D.C. 2011) (collecting cases). In particular, where an agency adopts "[p]rocedural rules that affect individual rights," those rules are "binding against [the] agency." *Id*. at 84. *See also Morton* v. *Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *Lincoln* v. *Vigil*, 508 U.S. 182, 199 (1993) (agency violation of internal procedures invalidated); *Lopez* v. *Fed. Aviation Admin*., 318 F.3d 242, 247 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003) ("On the other hand, had the agency's rules been intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion . . . the case would be 'exempt' from the general principle that an administrative agency may relax or modify its procedural rules adopted for the orderly transaction of business . . . when . . . the ends of justice require it.") (internal citations omitted); *Chiron Corp. & PerSeptive Biosystems* v. *Nat'l Transp. Safety Bd*., 198 F.3d 935, 944 (D.C. Cir. 1999) ("Manuals or procedures may be binding on an agency when they affect individuals' rights."); *Montilla*, 926 F.2d at 167 (same as applied to ICE's predecessor).

Here, for at least three reasons, it is clear that written ICE Family Residential Standards guarantee to detainees the right to telephone medical professionals confidentially during legal visits:

*First*, ICE rules permit legal assistants and their clients to telephone anyone they please on ICE telephones, and to do so confidentially, as long as the calls are "relevant" to a legal visit:

> [ICE] will ensure that local rules allow each resident to meet privately with current or prospective legal representatives and their legal assistants. (Ex. A ¶ III.F.1.)
>
> [ICE] will maintain a land-line telephone in each legal visitation room for use by attorneys and residents for legal visitation purposes relevant only to the specific visit. (Ex. A ¶ III.C.2.)
>
> The substance of conversations during legal visits between legal representatives or assistants and a resident are confidential, and will not be subject to auditory supervision by FRC or ICE staff." (Ex. B ¶ III.L.1.)[7]

A telephonic mental health evaluation coordinated by a detainee's legal representative for the purpose of supporting that detainee's request for reconsideration of a negative credible fear determination or re-interview is plainly "relevant" to that specific legal visit. By explicitly restricting telephone calls to "purposes relevant only to the specific visit," ICE forswears additional restrictions. In particular, no ICE rule restricts telephone calls on security grounds, and any such rule would be arbitrary and unenforceable in light of ICE's policy allowing

---

[7] *Accord* (Ex. B at ¶ 5.8(V)(11)(b) (available at https://www.ice.gov/detention-standards/family-residential visited May 13, 2017), which provides:

> [E]ach facility shall develop procedures that liberally allow an opportunity for consultation visitation, in order to ensure compliance with statutory and regulatory requirements and to prevent delay .... Given the time constraints, consultation by mail will generally not prove viable.
>
> The facility shall facilitate consultation visitation by telephone and face-to-face, and staff shall be sensitive to individual circumstances when resolving consultation-related issues.
>
> Consultation visitation shall be allowed during legal visitation hours and during general visitation hours; however, confidentiality shall be ensured only during legal visitation hours.

unrestricted telephone use during legal visits. *See Pearson* v. *Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999) (APA bars agency action that lacks a rational explanation.).

*Second*, the text of the only rule that ICE cited to revoke Ms. Perris's visitation rights explicitly limits the rule to in-person, on-location visits by requiring ICE to provide a "location" for such visits—and by identifying (in the accompanying pre-approval Request form) the "Medical Service Provider[s]" to which it applies as "Visitors" appearing at detention facilities for "visits":

> [ICE] shall provide a location for the examination but no medical equipment or supplies, and the examination must be arranged and conducted in a manner consistent with security and good order.
> (Ex. D at ¶ 4.3(V)(26))
>
> For safety and security of Family Residential Center (FRC) residents and staff, FRCs will require all prospective Legal **Visitors** (Independent Medical Service Provider or Expert) to pass pre-clearance/record checks seventy-two (72) hours prior to the scheduled **visit**. The pre-clearance/record checks will include, but not limited to: identity verification, current employment or educational status, certification of medical license, and arrest and criminal history, underlying the applicant's request for medical **visitor** designation. (Ex. E (emphasis added).)

Nowhere in any statute, regulation, or ICE policy are persons who speak by telephone with detainees referred to as "visitors," nor are telephone calls regulated as "visits." As a result, this rule does not apply to telephonic mental health evaluations, and it would be arbitrary to argue otherwise. *See Mission Group Kansas, Inc. v. Riley*, 146 F.3d 775, 782 (10th Cir. 1998) (If courts give effect to agency interpretations of open-ended legislative rules, they will allow agencies to substitute regulatory ambiguity for statutory ambiguity, thereby making a "mockery of . . . the APA.").

*Third*, ICE rules require the "conspicuous" posting in writing of the rules governing legal visitation:

> FRCs will provide notification of the rules and hours for legal visitation, as specified above, and conspicuously post this information in the common areas and visiting areas for general and legal visitors. (Ex. A¶ III.H.3.)

The May 12 email aside, no written rule anywhere requires, let alone conspicuously requires, prior approval of evaluations conducted telephonically. As a result, ICE violates its own rules by enforcing this new written pre-approval policy without prior posting.

c. ICE Cannot Violate Its Rules in the Guise of Interpreting Them.

To the extent ICE argues that it is merely interpreting its written policy concerning pre-approval for in-person medical examinations (Ex. D at ¶ 4.3(V)(26)) to apply to telephonic mental health evaluations, such an interpretation would be impermissible. Although courts ordinarily defer to reasonable agency interpretations of their own rules, "[d]eference is undoubtedly inappropriate . . . when the agency's interpretation is plainly erroneous or inconsistent with the [plain language of] the regulation." *Christopher* v. *SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (citations and quotations omitted).

Here, as set forth above, requiring prior approval for expert mental health evaluations conducted telephonically is inconsistent with the plain meaning of ICE's own rules. Courts "should not defer to an agency's interpretation imputing a limiting provision to a rule that is silent on the subject, lest [it] permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." *Appalachian Power Co.* v. *EPA*, 249 F.3d 1032, 1048 (D.C. Cir. 2001) (per curiam) (citations and quotations omitted).

Because ICE's actions are contrary to statute, regulation, and ICE's own policies, plaintiffs are likely to prevail on the merits of their APA claim.

**B. ICE's Actions Are Causing Irreparable Harm to Plaintiffs.**

Plaintiffs are suffering irreparable harm as a result of Defendants' violations of the First Amendment of the Constitution. "It has long been established that the loss of

constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills* v. *District of Columbia.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal citations omitted). As a result, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A Wright & Miller, Fed. Prac. & Proc. § 2948.1 (2d ed. 2004)). In particular, there can be no doubt that the ongoing violation of Plaintiffs' First Amendment rights of association with their clients at STFRC constitutes irreparable harm necessary to support a preliminary injunction. *See Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Chaplaincy of Full Gospel Churches*, 454 F.3d at 299-301 (same).

In addition, Plaintiff DPBP and participating member TRLA suffer irreparable harm because Ms. Perris's primary job responsibilities require her to access clients at STFRC. Ms. Perris is unable to speak with detainee clients or provide any meaningful support to DPBP while her access is restricted. Ms. Perris is one of just six individuals working for DPBP; suspension of her visitation rights has greatly impeded DPBP's ability to provide legal services at STFRC. (Fluharty Declaration ¶ 25; Perris Declaration ¶ 18.)

### C. ICE's Published Policies Prove that the Requested Injunction Threatens No Harm to ICE.

"In considering whether the balance of equities favors granting a preliminary injunction, courts consider whether an injunction would substantially injure other interested parties." *ViroPharma, Inc.* v. *Hamburg*, 898 F. Supp. 2d 1, 28 (D.D.C. 2012) (citations and internal quotations omitted); *see also Tex. Children's Hosp.* v. *Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) ("The balance-of-equities factor directs the Court to balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested

relief. . . . [T]he balance of equities may favor a preliminary injunction that serves only to preserve the relative positions of the parties until a trial on the merits can be held.") (internal quotations omitted).

ICE cannot show how permitting detainees to gather evidence telephonically can harm it in any way, especially in light of the fact that ICE's own policies permit detainees and their legal representatives to telephone anyone they wish relevant to the legal visit, with no pre-approval requirement. Nor would any harm result from restoring Ms. Perris's visitation rights, which she exercised without violating any written ICE rules. Plaintiffs only request a preliminary injunction to preserve the status quo. Where, as here, an injunction would cause no harm to one party but prevents irreparable harm to another, injunction should be granted. *See Texas Children's*, 76 F. Supp. 3d at 246 ("It is thus not the case that the alleged irreparable economic injury suffered by the Plaintiffs would be offset by the corresponding economic injury to the [Defendant]. The balance of equities therefore favors an injunction.").

**D. The Injunction Serves the Public Interest in Ensuring that Government Agencies Follow the Law, and in Protecting Plaintiffs' First Amendment Rights.**

An injunction would serve the public interest by ensuring that agencies comply with the law and applicable regulations. *See ViroPharma*, 898 F. Supp. 2d at 29 ("[T]he public always has an interest in agency compliance with the law."); *Mass. Fair Share* v. *Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985) ("It has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated."). Plaintiffs have demonstrated that ICE's new written policy is inconsistent with the INA, regulations, and its own policies; an injunction in this case would help to ensure ICE's compliance with applicable law. Further, an injunction would serve the public interest by protecting Plaintiffs' constitutional rights. *See Tucker* v. *City of Fairfield*, 398 F.3d 457, 464

(6th Cir. 2005) ("[T]he public interest factor in this case clearly weighs in favor of protecting the First Amendment [associational] rights of the Union's members."); *Joelner* v. *Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("[I]t is always in the public interest to protect First Amendment liberties."). ICE's suspension of Ms. Perris's visitation rights unlawfully restricts Plaintiffs' rights to associate with their clients. An injunction in this case would ensure that ICE respects the statutory, regulatory, and constitutional rights of Plaintiffs and Plaintiffs' clients, uniquely vulnerable mothers and their children.

As the balance of factors weighs heavily in Plaintiffs' favor, the issuance of a preliminary injunction is warranted. *See O'Donnell Constr. Co.* v. *District of Columbia*, 963 F. 2d 420, 429 (D.C. Cir. 1992).

## CONCLUSION

The Court should enter a preliminary injunction (i) reinstating Ms. Perris's access to STFRC while she complies with ICE legal visitation rules, provided that Ms. Perris may not be excluded for facilitating telephonic mental health evaluations, and (ii) prohibiting ICE from enforcing its May 12, 2017 written policy concerning pre-approval for telephonic mental health evaluations, pending a final decision in this case.

Dated: Washington, D.C.
June 1, 2017

Respectfully submitted,

/s/ Melissa Crow
Melissa Crow (DC Bar No. 453487)
American Immigration Council
1331 G Street, N.W., Suite 200
Washington, DC 20005
(202) 507-7523

/s/ Amanda Flug Davidoff
Amanda Flug Davidoff (DC Bar No. 978033)
Lucas Lallinger (DC Bar No. 1046778)
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC 20006
(202) 956-7500

/s/ Rebecca Scholtz
Rebecca Scholtz (*pro hac vice* motion pending)
Catholic Legal Immigration Network, Inc.
c/o University of St. Thomas
Interprofessional Center
30 South 10th Street
Minneapolis, MN 55403
(651) 962-4833

Richard H. Klapper (*pro hac vice* motion pending)
Veronica W. Ip (*pro hac vice* motion pending)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Attorneys for Plaintiffs*